UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CITY OF MARYSVILLE GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:09-cv-00659-EJL -CWD |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| NIGHTHAWK RADIOLOGY HOLDINGS, INC., DR. PAUL BERGER, TIM MAYLEBEN, and GLENN R. COLE, | |
| Defendants. | |

## **REPORT**

### **INTRODUCTION**

Defendants' Motion to Dismiss the Amended Complaint is currently pending before the Court, as are two unopposed motions to take judicial notice of several filings with the Securities and Exchange Commission. (Dkt. 82, 86, 92.) The Court conducted a hearing on the pending motions on June 9, 2011. There were no objections to the motions requesting the Court to take judicial notice of attached SEC filings, and therefore the

Court granted the motions and considered the materials. (Dkt. 98, 99.) After the hearing, the parties filed supplemental authority and additional briefing. (Dkt. 102, 103, 104.) The Court did not request additional briefing, and therefore did not consider the additional arguments presented by the parties, but did review the case law submitted.

After carefully considering the parties' memoranda, the relevant legal authority, and the matters submitted for judicial notice, the Court recommends that the Motion to Dismiss be granted.

## FACTS[1]

Plaintiff has filed suit on behalf of a purported class of purchasers of NightHawk Radiology Holdings, Inc. ("NightHawk") securities between May 2, 2007, and May 7, 2008. NightHawk specialized in providing to United States' hospitals "preliminary reads" or interpretations of radiologic images taken of emergency room patients during off hours. The preliminary reads were performed by radiologists in Australia and Switzerland that NightHawk retained on a contract basis. The preliminary reads were followed up by "final" reads and reports prepared during normal business hours by radiologists in the United States.

Defendant Paul Berger, M.D., founded NightHawk along with his son, Defendant Jon Berger. When NightHawk went public in 2006, both Dr. Berger and Jon Berger

---

[1] The facts are taken from the Amended Complaint on file in this matter, and are accepted as true solely for purposes of the instant motion. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).

served on NightHawk's board of directors and were involved with its daily operations. Dr. Berger served as NightHawk's President and CEO, while Jon Berger served as NightHawk's Vice President of Sales and Marketing prior to assuming the role of Senior Vice President. Defendant Glenn Cole served as NightHawk's Senior Vice President and CFO, while Defendant Timothy Mayleben served as NightHawk's Executive Vice President and COO.

As part of its plan to overcome increased competition from other teleradiology service providers, NightHawk engaged upon an ambitious expansion plan in 2007. NightHawk acquired Teleradiology Diagnostic Service ("TDS") for a price of $23 million on February 9, 2007, which purchase was touted as expanding NightHawk's presence in California and providing NightHawk with U.S. based radiologists to perform both preliminary and final reads. NightHawk's second acquisition, The Radlinx Group ("Radlinx"), was purchased for $53 million on April 9, 2007. The purchase was expected to increase NightHawk's expansion into the final reads market. Finally, NightHawk acquired Midwest Physician Services, LLC ("Midwest") on July 16, 2007, for $62.5 million. Midwest had provided St. Paul Radiology with back office support, which services NightHawk planned to cross-sell to its existing radiology group customers.

Plaintiff claims that Defendants misled investors with respect to NightHawk's purchase of TDS, Radlinx and Midwest, and the disastrous effects those acquisitions had upon NightHawk's radiology services. Specifically, Plaintiff alleges that the

foolhardiness of the three costly acquisitions was apparent from the beginning— U.S. radiologists on retainer and affiliated with the acquired companies cancelled their contracts with NightHawk because of NightHawk's lower compensation level; customer service deteriorated, causing NightHawk's "legacy" customers to cancel their contracts; NightHawk's profit margins deteriorated because Dr. Berger agreed to pay "bonuses" to contracting radiologists to provide hospital coverage; and finally, the poorly designed technology package designed for use by contracting radiologists and developed by Dr. Berger's other son, Scott Berger, was widely rejected. Plaintiff asserts that Defendants misrepresented the success of the acquisitions, falsely assured investors that legacy customers were continuing with the company, and issued false earnings guidance statements for 2007 and 2008.

With respect to the first issue, the integration of the TDS, Radlinx, and Midwest contract radiologists, Plaintiff alleges that Defendants falsely assured investors that integration was proceeding well when, in fact, NightHawk was experiencing customer cancellations and problems integrating the radiologists into NightHawk's platforms. While NightHawk informed investors publically that it added 35 radiologists, this statement allegedly was untrue because the radiologists refused to work for NightHawk given NightHawk paid the radiologists less than TDS and Radlinx paid for their reads. Specifically, Plaintiff alleges Mayleben stated 41 radiologists came from Radlinx, when in fact 20 of the 41 Radlinx radiologists refused to work for NightHawk. The radiologists

that remained with NightHawk were paid bonuses to retain them.

With the loss of radiologists available to perform reads, Plaintiff alleges there were periods of time when NightHawk did not have sufficient coverage for their existing legacy clients. Consequently, customer service declined due to the scheduling problems the staff shortages created. Plaintiff alleges that, despite the known problems, Defendants publicly insisted NightHawk's customer retention rates remained unchanged at 95%.

Plaintiff alleges these problems, along with bonuses paid to the Radlinx and TDS radiologists, caused NitghtHawk's profit margins to fall. Yet, Plaintiff contends that Defendants publicly assured investors that its earnings guidance for 2007, and in 2008, remained optimistic. In fact, on July 25, 2007, NightHawk raised its 2007 guidance, projecting $155 million to $162 million in revenue and $0.94 to $0.98 in adjusted earnings per diluted share to reflect the acquisition of Midwest. Its preliminary outlook for 2008 of $215 to $225 million in revenue and $1.31 to $1.36 in adjusted earnings per diluted share was disclosed also at that time. In October of 2007, NightHawk discussed its third quarter results, and "reaffirmed" NightHawk's earnings guidance for 2008.

Dr. Berger's son, Scott Berger, had developed a software package named TALON, which was marketed to St. Paul Radiology as part of the acquisition of Midwest. St. Paul Radiology would provide business services, including using NightHawk's TALON clinical workflow technology, in exchange for a fee based upon a percentage of St. Paul Radiology's revenue. However, Plaintiff alleges that TALON's design was so poor, it

lead St. Paul Radiology to declare NightHawk in breach of its services agreement, and to the eventual unwinding of the Midwest transaction at a significant loss to NightHawk. Concerning cross-marketing, Plaintiff alleges that Defendants never successfully cross-marketed or sold Midwest's business services as it promised to any of its other customers, despite reporting success in that area.

Plaintiff alleges that, by concealing the truth about the devastating impact of the three acquisitions, Defendants artificially inflated the price of shares to the detriment of the Plaintiff class and to the benefit of the individual Defendants who sold their personally-held NightHawk stock during the class period. Dr. Berger sold 1,948,715 shares for total proceeds of $36,784,650.07, while Jon Berger sold 846,750 shares for total proceeds of $15,916,957.36. (Am. Compl. Ex. A, B, Dkt. 61-1 and 61-2.) Defendants each had Rule 10(b) stock sale plans in which the shares of stock were sold each month from February 2007 through November of 2007. (Am. Compl. ¶ 23, Dkt. 61.)

On February 13, 2008, NightHawk significantly reduced its earnings guidance for 2008, noting a delay in transitioning the Radlinx physician contracts to NightHawk's radiologist compensation model, issues with customer retention, and the inability to penetrate the final reads market. In response, the price of NightHawk stock fell 11% from $14.15 to $12.54 per share. (Am. Compl. ¶¶ 72–80.) On May 7, 2008, NightHawk announced its financial results for the first quarter of 2008, reporting sharply lower revenues and income and revealing "for the first time" that recurring operational

problems had reduced NightHawk's profitability. (Am. Compl. ¶ 81.) On July 30, 2008,

NightHawk announced its financial results for the second quarter of 2008. It was revealed

that, in the latter part of 2007 and early 2008, NightHawk experienced "service

difficulties primarily related to physician scheduling . . . and these service problems did

result in some customer loss." (Am. Compl. ¶ 89.) In addition, NightHawk reported that

pricing pressures would continue into the future because of a slowing of market volume

growth and declines in average prices. (Am. Compl. ¶ 88.) On May 8, 2008, allegedly in

response to Defendants' disclosures, the price of NightHawk stock fell 13.9% to close at

7.37 per share.

The Amended Complaint asserts causes of action for: (1) violation of Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5; and (2) violation of

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

## ANALYSIS

### 1. PSLRA Pleading Standards

Defendants move to dismiss the Amended Complaint under Fed. R. Civ. P.

12(b)(6) on the grounds that the Amended Complaint fails to state a claim upon which

relief may be granted. When considering a motion to dismiss pursuant to Rule 12(b)(6),

"[a]ll allegations of material fact made in the complaint are taken as true and construed in

the light most favorable to the plaintiff." *No. 84 Employer–Teamster Joint Council*

*Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir.2003). The

Court may consider the facts alleged in the complaint, documents attached to the

complaint, documents relied upon but not attached to the complaint when authenticity is

not contested, and matters of which the Court takes judicial notice. *Parrino v. FHP, Inc.*,

146 F.3d 699, 705-06 (9th Cir. 1998), *superseded by statute on other grounds*, 28 U.S.C.

§ 1453(b), *as recognized in Abrego Abrego v. Dow Chemical Co.*, 146 F.3d 676 (9th Cir.

2006).

To state a claim under Section 10(b) and Rule 10b–5 of the Exchange Act, 15

U.S.C. § 78j(b), a plaintiff must allege five elements: (1) a misstatement or omission (2)

of material fact (3) made with scienter (4) on which the plaintiffs relied (5) which

proximately caused their injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288

F.3d 385, 388 (9th Cir. 2002).[2] However, the pleading requirements of Fed. R. Civ. P.

9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") are more

stringent than those for most other pleadings challenged under Rule 12(b)(6).

*Desaigoudar v. Meyercord*, 223 F.3d 1020, 1021 (9th Cir. 2000); *Cooper v. Pickett,* 137

F.3d 616, 625 (9th Cir. 1997). In this regard, the Court will "consider *all* reasonable

inferences to be drawn from the allegations, including inferences unfavorable to the

plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002). And Plaintiff "must

---

[2] Count II, which asserts a cause of action under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, allows for imposition of individual liability against each named defendant for their role in any wrongful conduct found under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5. Therefore, a finding that the Amended Complaint should be dismissed for failure to adequately plead fraud under Section 10(b) and Rule 10b-5 would result also in dismissal of the dependent claims for individual liability under Section 20(a).

plead its case with a high degree of meticulousness." *Desaigoudar*, 223 F.3d at 1022; *see also Ronconi v. Larkin*, 253 F.3d 523, 429 (9th Cir. 2001) (stating that a complaint must plead "with particularity both falsity and scienter").

Here, the particularity of the first, second, third, and fifth elements of Plaintiff's Section 10(b) claims are contested. Defendants contend the statements made about NightHawk's projected earnings for 2007 and 2008, its prospects and integration progress, its business services and final reads market, its physician retention and compensation, and customer retention, were not false at the time they were made, and were merely "puffery." Defendants contend also that the statements were forward-looking statements protected under the "Safe Harbor" of the PSLRA. Second, Defendants assert Plaintiff has failed to establish a strong inference of scienter on the part of each defendant and cannot rely upon either their stock trades or their roles within the company to prove their knowledge. And finally, Defendants claim Plaintiff did not adequately plead loss causation because none of the losses allegedly suffered were connected to any of the challenged statements made by Defendants.

Defendants rely heavily upon *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001), in which the defendants made overly optimistic predictions about the future of its business, identified problems much later, and the plaintiffs used hindsight to allege that the defendants must have known about the problems earlier and therefore lied about them. (Def.'s Mem. at 1, Dkt. 83.) Defendants contend the complaint here should be dismissed

for the same reason expressed in *Ronconi* that "[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." (Def.'s Mem. at 1, Dkt. 83) (citing *Ronconi*, 253 F.3d at 432.)

On the other hand, Plaintiff contends that the three corporate acquisitions were a debacle from the inception, and therefore Defendants' optimistic statements were misleading. Plaintiff relies upon the statements of several confidential witnesses ("CW's"), whose statements are recounted in the Amended Complaint, asserting that Defendants knew of the acquisition problems, physician attrition, lack of customer retention, and lost profit margins from the beginning. Therefore, Plaintiff alleges, the problems were glaringly apparent and Defendants' optimism had no basis in reality.

As for scienter, Plaintiff contends that the individual Defendants had access to information demonstrating the problems with NightHawk's three acquisitions, and at the end of the class period, Dr. Berger admitted he had "talked a pretty good game," thereby implying he deliberately covered up NightHawk's shortcomings. Plaintiff contends that Defendants desired to cover up the company's shortcomings to avoid taking personal responsibility for the disastrous acquisitions and losing control of their family-run corporation. Finally, Plaintiff asserts it has established loss causation because the stock price dropped after the truth was revealed, and that this is sufficient for purposes of surviving the motion to dismiss.

## 2. Falsity and Materiality

Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact be not only false, but material. *In re Cutera Securities Lit.*, 610 F.3d 1103, 1108 (9th Cir. 2010). If the allegations are not material, none of the other elements of a 10b-5 claim need be considered, and the complaint is properly dismissed. *In re Cutera Securities Lit.*, 610 F.3d at 1108. To plead materiality, Plaintiff must "(1) specify each allegedly misleading statement or omission, (2) explain why the statement is misleading, and (3) if the allegation 'regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re Cutera Securities Lit.*, 610 F.3d at 1109 (quoting 15 U.S.C. § 78u–4(b)(1)(B)).

"For purposes of securities fraud, 'materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.' A statement is material if 'a reasonable investor would have considered it useful or significant.' The standard of materiality is an objective one." *U.S. v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) (internal citations omitted). The investors do not need to prove actual reliance upon or market reaction to the misstatements. *Jenkins*, 633 F.3d at 802.

Plaintiff paints a picture of a fraudulent scheme by arguing the three corporate acquisitions were so foolhardy that Defendants should have known of the problems early on and disclosed the issues NightHawk was having with the corporate integration. For instance, Plaintiff claims that, considering the majority of the $23,000,000 purchase price

of TDS was intangible good will, NightHawk had to retain TDS's radiologist contractors and customers. Similarly, Plaintiff claims the Radlinx purchase for $53 million dollars was a sham because all but $4 million dollars of the $53 million purchase price was comprised of intangible assets and "goodwill." Thus, at the first sign of trouble, Plaintiff claims Defendants should have disclosed the problems.

However, nothing about the risk was unknown to investors. Shortly after NightHawk completed all three corporate purchases with the acquisition of Midwest on July 16, 2007, NightHawk announced its third quarter results for the period ending September 30, 2007. (Davis Decl. Ex. A, Dkt. 84-1 at 2.) On its balance sheet, NightHawk disclosed current hard assets of $86 million, with over $155 million in assets comprised of "goodwill" and "intangible assets." (Dkt. 84-1 at 4.) NightHawk previously disclosed to investors during its May 2, 2007 earnings conference that it paid $23 million to acquire TDS and $53 million to acquire Radlinx, and made no promises other than it "expected" these acquisitions to be profitable. (Davis Decl. Ex. H, Dkt. 84-2 at 9.)

In addition, NightHawk disclosed it paid "cash" for Radlinx and TDS, disclosed that NightHawk assumed debt and increased its loan balance to $100 million so it could purchase Midwest. The balance of its debt as of September 30, 2007, was $99.8 million, and again NightHawk qualified its ability to service the debt with its "belief" that its "capital reserves" were sufficient to meet its debt payments, saying nothing about the contribution of profits from the acquisition of the three companies. (Davis Decl. Ex. N,

Dkt. 85 at 25.) NightHawk disclosed it used over $100 million in cash to acquire TDS, Radlinx, and Midwest, and ultimately obtained a loan to finance the acquisitions long term. The ambitious nature of NightHawk's expansion plan was in the open for investors to see, and investors knew at least as much as NightHawk about the acquisition costs and the corresponding lack of hard assets purchased. To rely upon the material risk the acquisitions represented as a basis for claiming fraud smells like "fraud by hindsight, [which] is not actionable." *Ronconi*, 253 F.3d at 430 n.12.

Turning to the specific statements Plaintiff contends were misstated or omitted, the Court finds that reviewing the statements in context rather than by topic presents an easier task, and allows the Court to explain more fully its rationale for recommending dismissal of Defendants' motion. There are five areas, or topics, upon which NightHawk principals made statements to investors—revenue and earnings guidance for 2007 and 2008; integration progress with the three acquired companies; ability to cross sell business services and expand into the final reads market; physician retention and compensation; and finally, customer retention. Each aspect of the acquisitions was discussed with investors at certain times during the purported class period.

**A. February of 2007**

NightHawk acquired TDS on February 9, 2007. TDS was a privately held, California-based provider of teleradiology services with its primary reach in California. NightHawk represented the TDS acquisition resulted in the acquisition of "32 customers

serving 59 sites," and 12 additional radiologist contractors performing off-hours reads. (Am. Compl. ¶ 27.) NightHawk disclosed that the majority of the $23 million dollar purchase price was comprised of intangible assets and goodwill. Plaintiff alleges that, to be profitable, NightHawk had to quickly and seamlessly integrate the TDS radiologists into NightHawk's business by securing privileges for them at other hospitals across the country where NightHawk also did business, and also retain TDS's customer contracts, which otherwise could be cancelled with 30-60 days notice.

Although prior to the class period, Plaintiff includes information about the TDS purchase in its Amended Complaint to support their claim that NightHawk should have known by May 2, 2007, that it had no reason to be optimistic about its future acquisitions of Radlinx and Midwest, because problems with customer cancellation and physician credentialing appeared early on. However, CW#1, whom Plaintiff relies upon to explain the problems with customer and physician retention, discussed the problems with Radlinx, not TDS. The only mention of TDS by CW#1 was that credentialing physicians had been a "problem." CW#1 provides no explanation or facts to support why NightHawk should have thought its next two acquisitions would be failures based upon unspecified "problems" related to TDS in the brief two month period between the TDS acquisition and the Radlinx acquisition. "Much of any business consists of having problems and dealing with them," and there is no reason given to support why Plaintiff thought the transition would be seamless. *Ronconi*, 253 F.3d at 430.

**B. May of 2007**[3]

May 2, 2007, marks the beginning of the class period, and the first of a series of public statements the parties filed in the record for the Court's review. Radlinx was acquired on April 9, 2007, less than one month earlier. At issue are several statements by Dr. Berger who stated that NightHawk was enjoying "record first quarter financial results" and "exceeding . . . expectations." Dr. Berger stated also that NightHawk continued to see "excellent growth in [its] core off hours business" and was "gaining traction" in the daytime and final reads service lines. However, Dr. Berger made a disclaimer as well, stating that "excluding the impact of the TDS acquisition . . . and start up investments in new offerings, we continue to show improvement in our operating margins. . . ." Also, Cole stated that revenues increased 23%, but that this figure excluded the impact of NightHawk's acquisition of TDS.

Mayleben's statements about Radlinx are at issue as well. Plaintiff contends that his statement about "starting to see the benefits" of the integration of Radlinx and TDS was false. Mayleben stated also that integration efforts were "in their very early stages but . . . proceeding very well," as NightHawk was "working with the customers and physicians . . . to help them transition to the NightHawk platform." Mayleben stated that 35 radiologists were added to the team, bringing the number of U.S. based physicians to over 50. Mayleben was "pleased with the very early success," but cautioned NightHawk

---

[3] The May 2007 public statements are found in the record attached as Exhibits B and H to the Declaration of Claire Loebs, Dkt. 84-1 at p. 5, and 84-2 at p. 5, respectively.

was still in the "roll out phase."

The optimistic statements about how well NightHawk was proceeding made by Dr. Berger, Cole, and Mayleben are immaterial and too vague to have caused a reasonable investor to rely upon them. *See In re Syntex Corp. Securities Litigation*, 855 F.Supp.1086, 1095 (N.D. Cal. 1994) *aff'd*, 95 F.3d 922 (9th Cir. 1996) (holding as non-actionable puffing the phrases "'we're doing well and I think we have a great future,' 'business will be good this year . . . we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . . ,' 'everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well' and that 'I am optimistic about Syntex's performance during this decade' "). The statements are nothing more than "puffing," which reasonable investors should know do not guarantee success. *Id*. Vague statements of optimism do not amount to a securities violation. *Cutera*, 610 F.3d at 1111 (stating "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.").

As for the statements of fact, the Court finds the statements about revenues were qualified, and other allegations by Plaintiff about physician retention numbers being false lack a sufficient factual basis. Plaintiff claims that NightHawk mislead them concerning prospective revenue growth, but Dr. Berger and Cole excluded the impact of the TDS acquisition in their forecasts of operating margins and revenue growth. Mayleben's

statement about the acquisition of 35 physicians is claimed to be false, but CW#1's

statements about the difficulty with physician integration are consistent with Mayleben's

statement that the transition to the NightHawk platform was in its early stages, and they

were "working with" physicians. CW#1 states no concrete numbers to indicate that the

statement Mayleben made about the number of physicians added to the team was false

when made, other than stating there were problems with integration due to higher pay and

delays in credentialing. CW#1 did state that NightHawk retained 21 Radlinx radiologists,

but does not attach any temporal period to contradict Mayleben's statement made in May

of 2007.

The Plaintiff's allegations about physician retention therefore lack a sufficient

factual basis, because the facts alleged by CW#1 simply report there were problems with

integration, but do not contradict or otherwise provide concrete numbers contrary to

Mayleben's statements.

### C. July of 2007[4]

On July 17, 2007, NightHawk announced the acquisition of Midwest in a press

release, explaining the addition of Midwest would allow NightHawk to provide an

integrated suite of radiology solutions which would include business services. Midwest

"looked forward" to providing those business services. NightHawk hoped to cross-sell

---

[4] The July 2007 public statements are found in the record attached as Exhibits C, D, I, and J to the Declaration of Claire Loebs, Dkt. 84-1 at p. 11, 84-1 at p. 13, 84-2 at p. 11, 84-2 at p. 15, respectively.

Midwest's services to NightHawk's current customers, and add an "estimated" eight to nine million dollars in revenue by doing so.

During a July 25, 2007, conference call, Mayleben cautioned that NightHawk's focus was "transformational," and that Midwest had not yet begun to provide services for any company other than St. Paul Radiology, with whom Midwest had been doing business prior to its acquisition by NightHawk. Ninety radiologists were part of the Midwest acquisition.

NightHawk participated also in a Second Quarter Earnings conference call. During that conversation, Dr. Berger, Mayleben and Cole were optimistic. For instance, Dr. Berger "believed" the final reads business presented a "huge opportunity," and he was "pleased" with the pace by which NightHawk was penetrating the final reads market. NightHawk's integration efforts were "ongoing," happening in "phases," going "very well," with benefits "expected" to be realized in the third quarter. And its business services arm, having recently been acquired, was expected to launch "most likely" in the fourth quarter. By the end of the second quarter, Dr. Berger stated NightHawk was providing services to 768 customers and 1379 sites, with a retention rate among existing customers of 95%. And the number of radiologists providing services had grown from 75 to 118, with 41 of those radiologists coming from the Radlinx acquisition.

Cole clarified that the integration efforts with respect to the radiologists were proceeding in stages, first with the transition to the NightHawk technology platform, and

next to NightHawk's compensation model. Cole disclosed that Radlinx physician compensation was "double" what NightHawk's compensation model was, but that once the technology was in place, Radlinx physicians would earn the same amount of money as they were earning prior to the acquisition by NightHawk. Dr. Berger expected the process to take up to nine months, meaning the transition would not be realized until April of 2008.

Cole indicated also that "scan volumes" were up, and provided a historical comparison of scan volumes from the prior year. Dr. Berger was "confident" that the 2007 adjusted earnings guidance, which had increased, would be achieved.

The statements concerning how the integration process was proceeding are, again, mere puffery and opinion that are not actionable. These include the statements about NightHawk's optimistic plans to cross-sell St. Paul Radiology's services, the hope that revenue would increase as a result, the opportunity presented by the final reads market, and the physician integration process.

Plaintiff takes issue with the compensation model causing Radlinx physicians to leave NightHawk after the acquisition, but again, Cole disclosed the issue with physician compensation, and Dr. Berger expected the transition to the NightHawk compensation model to take up to nine months. It is difficult, therefore, to understand how investors were mislead when Cole disclosed that Radlinx physicians had been earning "double" compared to NightHawk's compensation model and would take up to nine months to

transition to the NightHawk compensation model. The information about disparate physician compensation was disclosed, and Dr. Berger's, Cole's, and Mayleben's optimism about succeeding with physician retention are immaterial and too vague to have caused a reasonable investor to rely upon them.

The additional fact based statements about customer retention that Plaintiff claims were false and misleading similarly lack a sufficient factual basis in the Amended Complaint. CW#1 stated only that NightHawk lost "numerous" Radlinx customer accounts, and that "many of them" did not want to continue with NightHawk, with no identification of who knew they occurred, when those cancellations occurred, or how many occurred. CW#1 stated vaguely that "during 2007, NightHawk was losing more customers than it was reporting to the public," again with no concrete facts to indicate how many, when, or who knew this information. CW#1 stated that discoveries of cancelled customers were made during every month of the class period, and that NightHawk had "far fewer" customers than was being reported, but again no concrete facts accompany CW#1's statements.

The "report" that Mayleben demanded be run about how many customers had cancelled their contracts did not occur until the "end of 2007," which the Court can safely assume occurred well after Dr. Berger's July 2007 statements. Absent the essential factual background outlining the "who, what, when, where and how" of the events in question, Plaintiff has not established that Mayleben had knowledge at the time that his statements

were false or misleading. *In re NutriSystem, Inc. Securities Litigation*, 653 F.Supp.2d 563, 577 (E.D. Pa. 2009 (quoting *In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198, 217 (Del. 2002)).

In any event, CW#1's belief about the number of customers lost as disclosed by the late 2007 study does not appear to be inconsistent with Dr. Berger's statements. CW#1 "believed" the findings from the report initiated by Mayleben showed that NightHawk had "about 100 fewer customers," and that CW#1 "recalled" that at the time, NightHawk had been reporting that it had "something like 1,500 customers (sites)." Not only do "beliefs" fail to meet the particularity requirement of the PSLRA, but Dr. Berger's statements in July do not appear to contradict CW#1's mere belief that there were less than 1,500 customer sites—Dr. Berger actually reported 1,379 customer sites.

Plaintiff's allegations that the statements made during this time period were false and misleading are based upon mere speculation and belief, and fail the particularity and materiality requirements of claims pursued under the PSLRA.

### D. September and October of 2007[5]

During this period, NightHawk announced its third quarter financial results, and lowered its 2007 earnings guidance from $155–162 million to $152–155 million. NightHawk reaffirmed its 2008 guidance of $215–225 million in revenue. Although

---

[5] The September and October 2007 public statements are found in the record attached as Exhibits A, K, and N to the Declaration of Claire Loebs, Dkt. 84-1 at p. 1, Dkt. 85 at 1, and Dkt. 85 at p. 21, respectively.

NightHawk reported that third quarter 2007 revenues grew 79% and scan volumes grew 70%, NightHawk explained that its adjusted net income was "impacted by the record scan volumes and revenues, higher expenses associated with acquired companies where integration is not yet complete, interest expense on acquisition-related debt financing, and additional investments necessary to support future growth." The same qualifications were applied to its disclosed GAAP net income. In addition, NightHawk explained that its expenses were impacted by "temporary higher physician compensation levels."

Dr. Berger reported "significant progress on integrating recent acquisitions," and that NightHawk was "positioned" to capitalize on future market opportunities. Mayleben reported he was "pleased with [NightHawk's] progress," and that he expected "outstanding growth" for the remainder of the year and moving into 2008. NightHawk's balance sheet at this time reflected a combined total of $155,474,479 in "intangible" assets and goodwill, as compared to $86,322,628 in hard assets, such as cash, securities, and accounts receivable.

During NightHawk's third quarter earnings call on October 31, 2007, Dr. Berger explained that third quarter performance reflected "solid organic growth" in core "off-hours business and in the daytime finals market." Progress in integrating the three acquisitions was proceeding, and NightHawk had a "solid platform for future growth." Dr. Berger and Mayleben explained that the 2007 earnings guidance was revised downward due to several factors, including the fact that (1) NightHawk's clinical

workflow technology offering was not going to meet expectations; (2) final reads business, while growing, had a full sales pipeline but the sales cycle was longer than expected; and (3) the need for radiology interpretations was increasing at a rate that outpaced the number of radiologists available to read scans.

All of the above statements reflect, if not in detail, the problems NightHawk was experiencing with the integration process that Plaintiff complains were being withheld. NightHawk disclosed its precarious cash situation compared to its high investment in intangible assets; its problems with integration, including a slow sales cycle in the final reads market despite a full pipeline; the lack of radiologists to interpret scans; excessive physician compensation; heavy debt load and related interest expenses; and that NightHawk, despite being in the third quarter of 2007, was simply "positioned" to capitalize on new growth opportunities, not that it actually had done so. Despite these cautionary statements, Plaintiff contends that it was misled during the October 31, 2007 earnings call about several areas of NightHawk's business. A closer examination reveals that Plaintiff simply failed to read between the lines. Had Plaintiff taken off its rose-colored glasses, the truth was there for it to see.

Plaintiff claims Dr. Berger mislead the market about the inroads NightHawk was making into the final reads business, contending that his statement that the sales pipeline was full and growth was accelerating was untrue. However, Dr. Berger disclosed in July that NightHawk had "expected" benefits in the final reads market to be realized in the

third quarter, but his statements in October clearly reflect that growth had not occurred. In addition, Dr. Berger stated that the sales pipeline was full, but contracts were taking longer—in other words, there was a backlog that was not being capitalized upon quickly, running the risk that contracts would be cancelled if not fulfilled.

Plaintiff claims Mayleben mislead the market about radiologist retention because he failed to disclose that one-half of the Radlinx doctors had refused to work for NightHawk, those that stayed with NightHawk were paid bonuses, and the drop in physician numbers caused gaps in coverage. Mayleben disclosed the truth, however, that twenty-one Radlinx radiologists were retained, slightly more than one-half of the forty-one radiologists recruited in July 2007, which figure Mayleben previously had disclosed in NightHawk's second quarter earnings conference call. NightHawk also disclosed the gaps in coverage and the higher physician compensation, because Cole had stated to investors in July that compensation for Radlinx physicians was "double," and at this time disclosed that scans were up but that NightHawk lacked sufficient physicians to read them. Cole's statement in conjunction with the number of Radlinx physicians that had left NightHawk should have alerted investors sufficiently about radiologist retention.

Plaintiff claims Mayleben mislead investors concerning customer retention rates, because customers had been cancelling their contracts while Mayleben stated "customer retention rates remained unchanged." Mayleben stated that the number of sites had increased by 90 over the previous quarter, bringing the numbers up to 752 radiology

group customers and 1,469 hospital sites. The prior quarter, Mayleben disclosed there were 768 radiology group customers, meaning the numbers had actually fallen in that area, and 1,379 customer sites, 90 sites less than he reported in October. Yet the only facts indicating Mayleben's statements were false are the vague, unspecific, and fuzzy recollections of CW#1, discussed above, that NightHawk had "about" 100 fewer customers than the approximate 1,500 sites they were reporting, with no concrete facts to support the allegations. If CW#1's comments are given credence, the allegations simply mean that no increase had occurred, and retention rates had not changed, which is exactly what Plaintiff indicates Mayleben stated to them.

The final area of misinformation Plaintiff contends it received concerned NightHawk's 2008 earnings guidance. Mayleben allegedly mislead the market about the effects of NightHawk's current experience on the assumptions underlying the guidance. Specifically, if the final reads pipeline of business was lacking, which Plaintiff claims it was, then NightHawk's 2008 guidance was not achievable. However, Mayleben had discussed the backlog, stated that final reads were only 8 or 9% of NightHawk's business, which percentage was small compared to its hundreds of millions of dollars in revenue. And, he had clarified that growth opportunities were significant, but NightHawk had only begun to "scratch the surface of the opportunity." Mayleben therefore disclosed that NightHawk's current revenue stream from the final reads business was small, and only that NightHawk saw an opportunity for growth, without quantifying the growth.

Plaintiff's allegations with respect to this area of misinformation require more than speculation based upon Mayleben's optimistic and subjective assessment of the opportunity presented by the final reads business. These allegations therefore fail to meet the particularity and materiality requirements. *In re Cutera Securities Litigation*, 610 F.3d at 1111.

### E. January of 2008[6]

During January, Plaintiff alleges that the truth began "to leak into the market" and NightHawk's stock price dropped. In its January 28, 2008 press release, NightHawk announced its preliminary "unaudited financial results" for 2007. NightHawk expected to report revenue in the range of $151 to $152 million, and adjusted earnings per diluted share in the range of $0.90 to $0.91. The press release explained that the 2007 results were impacted by "slightly lower fourth quarter volumes due to greater than expected seasonality, and a delay in transitioning the former Radlinx physician contracts to the company's compensation model." Plaintiff contends that, in response to this "partial revelation of the truth," NightHawk stock prices fell 14% from $18.88 to $16.24 per share.

However, Plaintiff overlooks that NightHawk previously had lowered its 2007 earnings guidance from $155–162 million to $152–155 million in October of 2007. The January 28, 2008 press release simply continued that downward trend, and the range of

---

[6] The January 2008 press release is found in the record attached as Exhibit E to the Declaration of Claire Loebs, Dkt. 84-1 at p. 17.

revenue was anchored at the lower end of NightHawk's earlier revised 2007 earnings guidance. And, as discussed above, NightHawk had disclosed several issues and areas of problems to investors.

For example, NightHawk previously stated in July and October that Radlinx physicians were paid "double," as well as disclosed a host of other issues affecting the integration of the three acquisitions, such as the failure to capitalize on the backlog in the sales pipeline, the lack of physicians to read scans as compared to the high scan volume, and the loss of one-half of Radlinx's radiologists. There are no allegations why, suddenly, NightHawk's January 2008 disclosures were deceitful, when it previously had disclosed a great deal more information during the second and third quarter, and already had reduced its 2007 earnings guidance prior to January of 2008.

Plaintiff alleges, in essence, that the "complete" truth was being withheld and concealed by Defendants, but the Amended Complaint fails to identify what additional information needed to be disclosed to rectify the allegedly misleading nature of the statements made, nor does it identify what either Dr. Berger, Cole, or Mayleben knew or should have known that was not already disclosed. Accordingly, the allegations up until this time period fail to meet the specificity and materiality requirements of the PSLRA.

**F. February of 2008[7]**

February 13, 2008, marked the beginning of a new conservatism in NightHawk's earnings guidance. In its Form 8-K report, NightHawk announced the resignation of Cole and Mayleben, citing personal reasons for their departures. Apparently, Cole and Mayleben cited family reasons for stepping down from their positions. NightHawk disclosed its full year 2007 revenues were $151.7 million, at the lower end but within the range it expected to achieve in January of 2008. As for its three acquisitions, NightHawk remained positive, representing that they increased NightHawk's market share and the number of affiliated radiologists providing professional interpretations, and expanded NightHawk's service offerings. NightHawk announced it was providing services to "nearly 1,500 sites, representing 26% of all hospitals in the United States." NightHawk disclosed also that the company incurred higher short-term expense in 2007 related to the integration of the three acquisitions.

2007 scan volumes were reportedly higher, compared with scan volumes from 2006. However, NightHawk reiterated that scan volumes in the fourth quarter were impacted due to greater than expected seasonality and the Radlinx physician transition delay.

Plaintiff takes issue with NightHawk's 2007 fourth quarter earnings guidance,

---

[7] NightHawk's Form 10-K, Q4 earnings call, and Form 8-K are found in the record attached to the Declaration of Claire Loebs as Exhibit P, Dkt. 85-1 at p. 7, Ex. DD, Dkt. 92-4 at 1, Ex. F, Dkt. 84-1 at p. 21, respectively.

contending that it "secretly converted its cash bonuses, to stock compensation, an item that the company excluded from its definition of this non-GAAP measure of earnings." (Am. Compl. ¶ 71.) Apparently, in April of 2008, analysts reported that "undisclosed changes in the mix of compensation in 4Q07 obscured growing costs by shifting cash expenses (which are included in consensus estimates) into stock expenses (which are not)." (*Id.*) A sum of $2 million in cash payroll expenses evidently was reversed and exchanged for an equal amount of stock-based compensation, causing fourth quarter results to be inflated by a "5-cent tailwind to earnings for the period." The accounting adjustment may have "masked worrisome cost and earnings trends."

However, in Form 8-K, NightHawk indicated that GAAP net income was impacted by "higher non-cash charges for stock compensation, IBNR, and amortization of intangibles. . . ." NightHawk disclosed also that its presentation of adjusted net income "should not be considered a substitute for or superior to GAAP," and presented its financial statements both by GAAP, and with adjusted net income figures. (Davis Decl., Ex. F., Dkt. 84-1 at 27–33.) In all of its prior earnings statements, earnings results were presented by GAAP, side-by-side with the alternative adjusted net income approach.

Elucidating upon its public statements, NightHawk principals participated in a fourth quarter earnings conference call. Cole disclosed that NightHawk's conservatism was driven by its "continued evolution into this finals market," and disclosed that it still had not capitalized upon expanding its business services offerings from the acquisition of

Midwest, because St. Paul Radiology was its "only customer." Dr. Berger explained NightHawk had "just not done a great job in executing in our sales roles" when it came to the finals market, hence the conservatism in its earnings guidance. Dr. Berger believed NightHawk "could have done better" in sales execution.

Concerning customer retention, Plaintiff takes issue with NightHawk's switch from measuring success based upon the number of customers NightHawk retained. Dr. Berger claimed that volumes were a better metric, and explained that NightHawk had a "93% retention in volumes." Dr. Berger explained that same site volume declines were "higher than anticipated at 9% compared to seasonal declines historically ranging from 4–8%." Mayleben further explained that NightHawk was then serving 1,491 sites, or 26% of all hospitals, but that the beginning of "consolidation in the industry [was] making customer and site count less important" than comparing "retained volume." Presumably, as consolidation occurred, the number of sites decreased but one could consequently expect scan numbers to increase from the additional volume per site. Accordingly, Plaintiff was offered an explanation for the change.

Dr. Berger elaborated also on the Radlinx physician transition, explaining that the transition to the compensation model was delayed deliberately, and that the process of obtaining hospital privileges "took longer than expected." Mayleben explained that at the year end, it had 113 affiliated radiologists, and currently had 129 physicians under contract as new physicians joined at the beginning of 2008. Andrea Clegg, Vice President

of Finance, reminded investors that NightHawk retained only 20 of the 41 Radlinx physicians.

NightHawk issued an updated earnings guidance for 2008, projecting revenues to be in the range of $195 to $205 million to reflect increased conservatism, stressing that NightHawk was still in the "early stages" of its transition and would require "improved sales execution." NightHawk's revised 2008 outlook was much lower than its July 2007 preliminary outlook for 2008, which had projected $215 to $225 million in revenue and $1.31 to $1.36 in adjusted earnings per diluted share. NightHawk's revenue guidance was based upon several assumptions, including preliminary reads volume growth of 20--26%, business services revenue growth of 90%, and organic revenue growth of 18--24%. Cole indicated that several key factors would impact these revenue projections, such as NightHawk's ability to generate new sales, expand into the final reads market, and "expand our business services offerings beyond our relationship with St. Paul Radiology, and the impact of customer retention."

Investors at this point in time had the benefit of comparing NightHawk's public statements with its earlier optimism. The 2007 earnings guidance previously had been downgraded, and during each conference call prior to February of 2008, NightHawk personnel disclosed that NightHawk was having issues with integration, transition, and sales conversion. Nothing had changed other than NightHawk's optimism. Recall, too, NightHawk had reported that expansion of its business services arm—Midwest—was not

expected to occur until the third quarter of 2007, and now NightHawk was reporting that it actually had not occurred. Additionally, NightHawk previously had reported that the Radlinx physician transition might not occur until April 2008, and now NightHawk was reporting a further delay. Finally, NightHawk had reported in the third quarter that it had insufficient radiologists to read scans, and now was reporting customer retention was a problem.

Again, the Amended Complaint fails to identify what additional information needed to be disclosed to render NightHawk's statements during February of 2008 sufficiently transparent. Nor does the Amended Complaint identify which Defendant knew what or allege how or when knowledge was obtained that the information they were giving investors was false. Plaintiff simply wants to "strongly infer" that Dr. Berger and others were not answering investors' questions honestly, with no concrete facts other than CW#1's vague assertions. (*See* Am. Compl. ¶ 78.)

### G. May of 2008[8]

May of 2008 marks the end of the purported class period. On May 7, 2008, NightHawk revised its outlook for 2008, and announced a "Dutch Auction" tender offer to provide stockholders the opportunity to tender all or a portion of their shares and receive a return of their investment. During the earnings calls, NightHawk announced that

---

[8] The May 7, 2008 Press release, Q1 Earnings calls, and Form 8-K are found in the record attached to the Declaration of Claire Loebs, Ex. G, Dkt. 84-1 at p. 1, Ex. BB, Dkt. 93-2 at p. 1, Ex. M, Dkt. 85 at p. 15, and Ex. Z, Dkt. 85-2 at p. 39, respectively.

it needed to improve in three key areas—sales execution, customer service and satisfaction, and cost reduction. Because of its lack of sales execution, NightHawk revised its 2008 revenue guidance down to a range of $171 to $181 million, at a per share price of $.70 to $.82. Dr. Berger discussed the increased costs, alluded to previously because Radlinx physicians were paid double, because of unanticipated professional service expenses.

NightHawk discussed also that competitors were making inroads into the market, and that NightHawk had not yet made sufficient inroads into the final reads market. However, NightHawk had increased its finals business from 8% of total revenue to 11% of total revenue. NightHawk discussed its issues with physician scheduling and the impact that had upon revenues.

Again, however, all of these disclosures had been alluded to, had investors simply stripped down the happy talk, in prior earnings calls. NightHawk had a precarious balance sheet, had made three major corporate acquisitions totaling over $100 million dollars, and was attempting an ambitious expansion plan. Yet in its third quarter of 2007, NightHawk revealed some of the problems it was having, warned investors that it may not capitalize upon its plans, and now disclosed fully that it had been unable to rectify them in the short time span since October of 2007.

The facts, when read in conjunction with the allegations of the Amended Complaint, simply paint a picture of an overly optimistic slant to the business problems

NightHawk experienced as a result of its expansion plans. Throughout the class period, NightHawk did disclose some of the issues it was having and warned of the risks quite clearly. Each quarter, NightHawk revised its earnings guidance based upon its experiences, contrary to the suggestion in the Amended Complaint that the stock drop was a sudden surprise in May of 2008. There is not much more to this case beyond the fact that NightHawk acquired three companies and expected to increase its profits by acquiring new customer sites and affiliated radiologists to handle the new customer demand; NightHawk experienced problems with retaining customers and radiologists to service those customers, and did not capitalize upon sales to create new demand for services; and the acquisitions were not as productive as NightHawk had expected.

In the world of high stakes business, the failure to be as productive as predicted can be true even when initial expectations were that profits would increase. Plaintiff's averments of fraud are not specific and corroborated sufficiently for pleading purposes of claims covered under the PSLRA.

## 3. Safe Harbor and NightHawk's Financial Guidance

The PSLRA provides an additional barrier at the pleading stage in the form of a safe harbor for "forward-looking statements." *In re Cutera Securities Lit.*, 610 F.3d 1103, 1111 (9th Cir. 2010). A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. §

78u-5(i)(1)(A). The safe harbor provision states in relevant part that:

> a person . . . shall not be liable with respect to any
> forward-looking statement, whether written or oral, if and to
> the extent that–
> (A) the forward-looking statement is–
>  (i) identified as a forward-looking statement, and is
> accompanied by meaningful cautionary statements identifying
> important factors that could cause actual results to differ
> materially from those in the forward-looking statement; or
>  (ii) immaterial; or
> (B) the plaintiff fails to prove that the forward-looking
> statement–
>  (i) if made by a natural person, was made with actual
> knowledge by that person that the statement was false or
> misleading; or
>  (ii) if made by a business entity;[,] was–
>   (I) made by or with the approval of an executive
>   officer of that entity; and
>   (II) made or approved by such officer with
>   actual knowledge by that officer that the
>   statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). The Defendants' state of mind is not relevant to the safe harbor

provision under subsection (A), while subsection (B) governs unidentified forward-

looking statements and forward-looking statements unaccompanied by meaningful

cautionary language. *In re Cutera Securities Lit.*, 610 F.3d at 1112.

 With respect to the allegations in the Amended Complaint, the Court concludes

that, even if the statements discussed above are considered false, they are protected by the

PSLRA safe harbor provision for forward-looking statements. As such, they are

immaterial and may not serve as the basis for a Rule 10b-5 claim under the Exchange Act.

A forward-looking statement can be a projection of revenues, income, earnings, or other

financial items. 15 U.S.C. § 78u-5(c)(1). Cautionary language must be related to the forward-looking statements but need not actually accompany them. *In re Nutrisystem, Inc. Securities Litigation*, 653 F.Supp.2d at 579.

NightHawk projected its earnings for 2007 and 2008, as well as made predictions about the success of its acquisitions and its ability to capitalize on new growth. All of the SEC Filings, the conference calls, and the press releases reviewed by the Court contained a paragraph indicating that the statements were "forward-looking statements" as defined within the PSLRA, including growth strategy, expansion, market acceptance of its current service offerings, the benefits and integration of acquisitions, and an outlook on the company's future financial results. There was a warning each and every time that the statements were "subject to risks and uncertainties."

Further, NightHawk's third quarter earnings report contained a comprehensive list of risk factors, which included the following cautionary paragraph:

> We have a short operating history in an emerging market. As a result, our current business and future prospects are difficult to evaluate. You must consider our business and prospects in light of the risks and difficulties we encounter as an early-stage company in a rapidly evolving market. Some of these risks relate to our potential inability to:
> effectively manage our business and technology,
> effectively manage the integration of companies that we have acquired, or in the future may acquire,
> develop new services that complement our existing business
> market our services to customers . . .,
> acquire additional customers,
> successfully provide high levels of service quality as we expand the scale of our business,
> manage rapid growth in personnel and operations,

effectively manage our medical liability risk, and
recruit and retain radiologists and other key personnel.
We may not be able to successfully address these and the other risks
described in this report. Failure to adequately do so would harm our
business and cause our operating results to suffer. Furthermore, our limited
operating history has resulted in revenue growth rates that we may not be
able to sustain, and therefore may not be indicative of our future results of
operations. As a result, the price of our common stock could decline.

(Dkt. 85 at 29.) These cautionary statements were filed on November 6, 2007.

The cautionary language in NightHawk's third quarter filing specifically identified

and disclosed the risks that allegedly were realized throughout the class

period—specifically customer and physician retention, expansion of new services,

integration, technology offerings. The fact that NightHawk's principals voiced their

optimism that these difficulties could be overcome does not nullify their cautionary

statements. *Institutional Investors Group v. Avaya, Inc.*, 564 f.3d 242, 258 n.24, 25, 27

(3rd Cir. 2009).

Neither the Amended Complaint nor Plaintiff's briefing appears to contain any

discussion about why the above cautionary language, as well as the explanation of risks,

was insufficient. Rather, Plaintiff sets forth in a footnote on page 20 of their

memorandum that, to the extent the statements are identified as "forward-looking

statements, the argument fails because a 'mixed present/future statement is not entitled to

the safe harbor.'" Plaintiff cites *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d

702, 705 (7th Cir. 2008) to support its argument, and further claims that the cautionary

statements were not "meaningful," because it contends the warned of risks had already

come to pass.

However, in *Cutera*, similar cautionary language as contained in the press releases, earnings calls, and earnings statements submitted to the Court in this case was found to be sufficient and afforded the defendant the protection of the safe harbor. In *Cutera*, the cautionary language began with a notice that:

> [T]these prepared remarks contain forward-looking statements concerning future financial performance and guidance," that "management may make additional forward-looking statements in response to[ ] questions," and that factors like Cutera's "ability to continue increasing sales performance worldwide" could cause variance in the results. Cutera affirmatively warned that its ability to compete and perform in the industry depended on the ability of its sales force to sell products to new customers and upgraded products to current customers, and that failure to attract and retain sales and marketing personnel would materially harm its ability to compete effectively and grow its business.

*In re Cutera Securities Lit.*, 610 F.3d at 1112. And it appears in this case, as in *Cutera*, Plaintiff attempts to collapse the test under 15 U.S.C. § 78u-5(c)(1). By arguing that the cautionary statements were not meaningful because the warned of risks had already come to pass, Plaintiff necessarily implies that Defendants knew of the falsity of the assumptions upon which the earnings statements were based.

However, the same argument was rejected in *Cutera* as "a conjunctive reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language. The difficulty

With this approach is that it ignores the plain language of the statute, which is written in the disjunctive as to each subpart." *In re Cutera Securities Lit.*, 610 F.3d. at 1112. Subpart A, the court explained, focuses solely on the defendant's cautionary statements, and not on the defendant's state of mind. Provided the forward-looking statement is identified as such and is accompanied by meaningful cautionary statements, the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter. *In re Cutera Securities Lit.*, 610 F.3d at 1112.

*Cutera* rejected the same argument advanced by Plaintiff here, and rejected the court's earlier comment in dicta contained in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 937 N. 15 (9th Cir.2003). In *No. 84,* the court suggested that "'a strong inference of actual knowledge' could except forward-looking statements from the safe harbor rule." *Cutera*, 610 F.3d at 1113. However, in rejecting its prior statement, the court held that the passing reference in *No. 84* offered "no statutory analysis or discussion of the safe harbor itself, and can only be characterized as obiter dicta." *Id.* Therefore, investors cannot rely upon an inference of actual knowledge to except identified forward looking statements from the safe harbor provision when the defendant invokes Subpart A of 15 U.S.C. § 78u-5(c)(1).

In the instant case, Plaintiff argues the safe harbor should be rejected because the warned of risks already had come to pass. Plaintiff therefore asserts the cautionary

statements were not meaningful because Cole, Mayleben, and Dr. Berger knew the risks already had occurred, thereby implying the same "strong inference of actual knowledge" rejected by the Ninth Circuit, and rejected by this Court.

However, NightHawk continually made statements that it was "on track" and "positioned" to capitalize on opportunities. It "hoped" to expand its business services offerings, and was in the "early stages" of transition. Throughout 2007, NightHawk's statements, when read in context, "cannot meaningfully be distinguished from the future projection of which they are a part." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3rd. Cir. 2009). None of the optimistic phrases used by NightHawk's principals made claims of fact, other than perhaps its report of physician numbers and customer sites. However, as previously explained, NightHawk disclosed that by the third quarter of 2007 it had lost one-half of the Radlinx physicians, and disclosed issues with consolidation of customer sites and problems with servicing customers.

Plaintiff simply makes vague assertions that NightHawk could not reasonably believe its challenges could be overcome because the problems were insurmountable. But, unlike in *Tellabs*, NightHawk never made any specific assertions about its current state of affairs that markedly differed from reality. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706 (7th Cir. 2008) (finding statements that company continued to maintain growth in a particular product actionable when, at the same time, it had deliberately flooded its customers with products they had not requested to create an

illusion of demand). In contrast to *Tellabs*, NightHawk did not make any comparable concrete claims. Therefore, Plaintiff's allegations do not transform NightHawk's optimism that its future projections were attainable into non-forward-looking assertions outside of the Safe Harbor.

By failing to overcome the safe-harbor protection of the PSLRA for NightHawk's 2007 and 2008 forward-looking revenue projections, as well as its projections about its future success in integrating its three acquisitions, all of which were accompanied by cautionary language, the Court recommends granting Defendants' motion to dismiss. *Cutera*, 610 F.3d at 1113.

## 4. Scienter

A complaint must state with particularity facts giving rise to a "strong inference " that the defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2); *Ronconi*, 253 F.3d at 429; *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). The requisite state of mind is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). The plaintiff must "state facts giving rise to a strong inference of deliberate recklessness or intent. It is not enough . . . to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (1999).

When the challenged act is a forward looking statement, the plaintiff must state

facts establishing the defendant acted with "'actual knowledge . . . that the statement was false or misleading.'" *Ronconi*, 253 F.3d at 429.

Recklessness is defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.*"* *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)

In the context of a Rule 12(b)(6) motion, the Court "should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter," *Gompper*, 298 F.3d at 897, and not whether any individual allegation, "scrutinized in isolation, meets that standard," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). In determining whether the pleaded facts give rise to a "strong" inference of scienter, the Court "must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323. The strength of an inference depends on its particular context: "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. A complaint will survive a motion to dismiss under the PSLRA "only if a reasonable person would deem the inference of

scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

With respect to Defendants' state of mind, Defendants argue that, with respect to each individual Defendant, Plaintiff has failed to allege any particularized facts establishing or inferring scienter. In addition, Defendants assert the Amended Complaint lacks facts that would establish a strong inference of scienter related to the earnings guidance NightHawk gave for 2007 and 2008. Plaintiff, however, argues that because Defendants were so involved in NightHawk's daily operations, and the false and misleading statements concerned operations at the "core" of NightHawk's business, the facts alleged sufficiently satisfy the "holistic" approach to establishing a strong inference of scienter.

**A. Core Operations**

Generally, the "core operations inference" is insufficient to plead scienter adequately under the PSLRA. *South Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). But under the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court explained that "omissions and ambiguities count against inferring scienter," yet are still properly considered. *South Ferry LP, No.2*, 541 F.3d at 784. *Tellabs* instructs that, while a high level of detail is required under the PSLRA, a court "should look to the complaint as a whole, not to each individual scienter allegation" and should "consider the totality of circumstances." *South*

*Ferry LP, No.2*, 542 F.3d at 784. Accordingly, under *South Ferry LP, No.2*, the core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter. 542 F.3d at 784. Nevertheless, if a complaint relies solely on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' "actual exposure to information, it will usually fall short of the PSLRA standard." *Id.* at 784. General awareness of the daily workings of the company's business "does not establish scienter–at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Id.* at 784–85.

Plaintiff relies heavily upon Defendants' positions within the company to infer knowledge. For example, Plaintiff argues that Cole "undoubtedly knew" that NightHawk was failing to integrate the three acquisitions despite stating that the acquisitions were "progressing," because he was one of the executives with primary responsibility for NightHawk's accounting determinations, and therefore had access to the reports that would have shown this was untrue. And Plaintiff asserts that Jon Berger knew NightHawk began losing customers by virtue of his position as head of the sales department. As for Mayleben, Plaintiff alleges that he had access to internal reports indicating the amount of customers NightHawk actually had. And finally, Plaintiff argues that Dr. Berger knew about the lost profits because he was the one who negotiated the bonuses to retain the Radlinx radiologists.

But none of these allegations rise to the level required by *Tellabs* and *South Ferry*. While Plaintiff asserts Defendants had "access" to the data, the allegations do not include specific allegations that defendants "actually did monitor the data that were the subject of the allegedly false statements." *South Ferry LP, No. 2*, 542 F.3d at 785. The allegations must go beyond a "mere inference" of management knowledge of core operations and specify actual details about Defendants' access to information within the company, and that they <u>actually did access</u> the information.

The Confidential Witness's statements are vague, conclusory, and require inferences about who knew what and when. For instance, CW#1 states that "discoveries of cancelled customers were made during every month of the Class Period," but fails to allege any specific detail about who knew about the customer cancellations and when they knew it. CW#1 states that the variance between the public reporting of customer numbers versus the actual customer numbers was "significant," but then states NightHawk only had "about 100 fewer" than the approximate 1,500 reported, or .6%. In addition, the witnesses do not allege whether the individual Defendants had access to this knowledge on a daily basis other than by virtue of their "positions" with NightHawk and their "family connections."

Plaintiff relies upon Dr. Berger's statement that he "talked a pretty good game" to imply that the integration of NightHawk's three acquisitions had not gone as well as planned. However, Dr. Berger's statement does not support an inference that company

insiders knew, or with deliberate recklessness disregarded, the severity of the problems presented by the corporate expansion. *Ronconi v. Larkin*, 253 F.3d at 432.

**B. Insider Trading**

Scienter may be established by proving insider trading. "Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005). However, Plaintiff admits, and does not refute, that Defendants each had Rule 10(b) stock sale plans in which the shares of stock were sold according to a pre-set schedule each month from February of 2007 through November of 2007. (Am. Compl. ¶ 23, Dkt. 61.) Mayleben and Cole also did not sell any stock during the class period, which negates scienter. *Ronconi*, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the  company's affairs were known to be false when made.") By virtue of the Rule 10(b) stock sale plans in place, as well as Mayleben and Cole's failure to sell any stock during the period, Plaintiff has not and cannot establish "unusual" or "suspicious" stock sales sufficient to establish scienter.

Taking all of Plaintiff's allegations concerning knowledge and insider trading, and viewing the Amended Complaint as a whole, the allegations are insufficient to meet the scienter requirement. The Court therefore recommends that the Amended Complaint be

dismissed. *Zucco Partners, LLC v. Digimarc Corp*, 552 F.3d 981, 987 n.1 (9th Cir. 2009).[9]

## CONCLUSION

Based upon the foregoing, the Court recommends that the Amended Complaint be dismissed. The complaint, although long, has not stated particularized facts that, taken as a whole, raise a strong inference that Defendants intentionally or with deliberate recklessness made false or misleading statements to investors. The fact that Defendants may have been overly optimistic is true perhaps, but Defendants disclosed the problems they were having and expected to have in the event their optimistic assertions did not materialize. NightHawk's 2007 earnings guidance was adjusted downward twice, and by the first quarter of 2008, when NightHawk realized it was not going to meet expectations, NightHawk adjusted its 2008 earnings guidance. At its core, Plaintiff's complaint that NightHawk underestimated the difficulties it would face when it acquired three companies, and its contracted radiologists, does not make out a fraud case. Taken as a whole, the allegations in this case do not raise a strong enough inference of securities fraud to meet the heightened pleading requirements of the PSLRA, and therefore the Court recommends dismissal under Fed. R. Civ. P. 12(b)(6)

---

[9] Because the Court concludes that the Amended Complaint fails the particularity and scienter requirements, it does not discuss the final issue of loss causation.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendants' Motion to Dismiss (Dkt. 82) be **GRANTED** without prejudice.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: September 12, 2011

Honorable Candy W. Dale
Chief United States Magistrate Judge